Clyde W. HART and Jane Hart Conserva, individually and on behalf of the Estate of Walter O. Briggs Trust Under Will f/b/o Jane B. Hart, Plaintiffs,

v.

COMERICA BANK, Boris Vasileff, Basil M. Briggs, Patricia Gormely Prince, and Miro, Miro & Weiner, P.C., Jointly and Severally, Defendants,

and

COMERICA BANK and Boris Vasileff, Third–Party Plaintiffs,

v.

Clyde W. HART, Counter–Defendant, Basil M. Briggs, Cross–Defendant, Jane B. Hart and Ann C. Hart, Third–Party Defendants,

and

MIRO, WEINER & KRAMER, P.C., (f/k/a Miro, Miro & Weiner, P.C.), Counter–Plaintiff and Third–Party Plaintiff,

v.

Clyde W. HART and Jane Hart Conserva, individually and on behalf of the Estate of Walter O. Briggs Trust Under Will f/b/o Jane B. Hart, Counter–Defendants,

and

Jane Briggs Hart, Third–Party Defendant.

No. 95–CV–76089–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 24, 1997.

---

Elizabeth N. McKenna, Plymouth, MI, for plaintiffs.

David Miller, James A. Smith, Morton H. Collins, Detroit, MI, for defendants.

## OPINION AND ORDER DISMISSING SOME CLAIMS FOR LACK OF JURISDICTION, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DISMISSING REMAINING MOTIONS AS MOOT

ROSEN, District Judge.

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

This matter is before the Court on various pending Motions filed by several of the parties in this multi-party, multi-claim lawsuit. Plaintiffs Clyde W. Hart and Jane Hart Conserva ("Cammie Conserva") commenced this action on December 18, 1995, as amended by their December 22, 1995 Amended Complaint.

### A. Plaintiffs' Claims.

In the Amended Complaint, Plaintiffs allege the following:

Count I: Breaches of Trust and Fiduciary Duty against Defendants (1) Comerica Bank (Corporate Co–Trustee of the Jane Hart Trust and, with Trust assets as security, lender to various Hart family members and their friends); (2) Boris Vasileff (Comerica Officer and Trust Executive assigned to the Jane Hart Trust); (3) Basil "Mickey" Briggs (Of counsel lawyer at Defendant Miro, Weiner & Kramer, former counsel to the Co–Trustees of the Jane Hart Trust, and investment partner of Jane Hart, his aunt); (4) Patricia Gormley Prince (counsel who performed legal work for the Co–Trustees and wife of Vasileff's boss, Thomas Gormley); and (5) Miro, Weiner & Kramer ("Miro");

Count II: Professional Negligence against Defendants (1) Briggs, (2) Prince, and (3) Miro;

Count III: Common Law Fraud against Defendants: (1) Comerica, (2) Vasileff, (3) Briggs, (4) Prince, and (5) Miro;

Count IV: Negligent Misrepresentation against Defendants (1) Comerica, (2) Vasileff, (3) Briggs, (4) Prince, and (5) Miro;

Count V: Innocent Misrepresentation against Defendants (1) Comerica, (2) Vasileff, (3) Briggs, (4) Prince, and (5) Miro;

Count VI: Exemplary Damages against Defendants (1) Comerica, (2) Vasileff, (3) Briggs, (4) Prince, and (5) Miro;

Count VII: Aiding and Abetting Breaches of Trust and Fiduciary Duty against (1) Comerica, (2) Vasileff, (3) Briggs, and (4) Prince;

Count VIII: Common Law Respondeat Superior, alleging that Comerica is responsible for the actions of Vasileff and that Miro is responsible for the actions of Briggs;

Count IX: Conversion against Comerica.

**B. Defendants' Various Cross–Claims, Counterclaims, and Third Party Complaints.**

In response to Plaintiffs' Amended Complaint, the Defendants have filed various claims:

(1) Defendants Comerica and Vasileff have filed (a) a counterclaim against Plaintiff Clyde Hart (Co–Trustee of the Jane Hart Trust, a son of Jane Hart, and a remainder beneficiary of the Jane Hart Trust); (b) a cross-claim against Defendant Briggs; and (c) a Third Party Complaint against Ann C. Hart (Co–Trustee of the Jane Hart Trust, a daughter of Jane Hart, and a remainder beneficiary of the Jane Hart Trust) and Jane Hart (lifetime income beneficiary of the Jane Hart Trust and investment partner with Briggs);

(2) Defendant Miro has filed (a) a counterclaim against Plaintiffs Clyde Hart and Cammie Conserva (daughter of Jane Hart and a remainder beneficiary); and (b) a Third Party Complaint against Jane Hart.

**C. The Motions Currently before the Court.**

(1) Defendant Miro's (a) Motion to Dismiss, alleging lack of diversity jurisdiction; (b) Motion to Dismiss or for Summary Judgment, in which Defendant Briggs joins, as to Plaintiffs; and (c) Motion for Summary Judgment against Jane Hart on its Third Party Complaint.[1]

(2) Defendant Prince's Motion for Summary Judgment as to Plaintiffs;

(3) Defendants Comerica and Vasileff's Motion for Summary Judgment as to Plaintiffs;

(4) Defendants Comerica and Vasileff's Motion for Summary Judgment as to Jane Hart and Briggs.[2]

---

1. On the record during the January 30, 1997 hearing on this matter, the Court denied Miro's Motion for Disqualification of E. Norma McKenna, counsel to Plaintiffs, as counsel to Third Party Defendant Jane Hart, finding no conflict and that the appropriate disclosure and consent procedures had been followed.

2. On January 13, 1997, the Court ordered the parties to address whether any potential issues raised by these Motions were impacted by the *Rooker–Feldman* Doctrine. *See* discussion, *infra.*

## II. *FACTUAL BACKGROUND*

### A. *The Jane Hart Trust.*

The will of Walter O. Briggs, effective upon his death in 1952, created trusts for each of his five children. Jane Hart, his daughter, is the lifetime income beneficiary of one of these trusts—the Jane Hart Trust. The Jane Hart Trust Document provides that upon her death, the Jane Hart Trust will be distributed *per stirpes* to her children—Plaintiffs Clyde Hart and Cammie Conserva are 2 of her 8 children, all of whom are remainder beneficiaries.

Although in its original form, the Jane Hart Trust Document contained no provision which permitted the Trust principal to be invaded during Jane Hart's lifetime, it was invaded during the 1980's and 90's [3], and it has since been amended to permit Trust principal assets to be used for making or securing loans for Trust beneficiaries. With respect to Trust management, the Trust Document states that the Jane Hart Trust shall have three Co–Trustees, a majority of which are needed to act on its behalf.

Since 1988, Ann Hart, Clyde Hart, and Comerica have been the Co–Trustees.[4] Briggs was Counsel to the Co–Trustees from 1970 through mid–1994, when Prince replaced him.[5]

### B. *The Pre–1992 Investments.*

Jane Hart began making investments with Briggs in the early 1980's pursuant to a partnership, which eventually included Ann Loeb Bronfman and was later re-named HBL (Hart, Briggs, Loeb) Limited Partnership.[6] Briggs was the counsel and sole general partner, while Hart and Bronfman were limited partners, although Briggs acted on their behalf pursuant to powers of attorney for each of them. In 1987, HBL invested in the River Place Inn project, which included renovating, in partnership with the Stroh family, an existing building on the Detroit River for the purpose of creating a luxury hotel in downtown Detroit. Construction cost overruns occurred, and as a result, in 1989, the HBL partners had to borrow nearly $3,000,000 from First Chicago Bank. When these loans came due, in late 1991, Briggs, on behalf of HBL, initiated efforts to borrow $2,500,000 from Comerica Bank for repayment of this prior loan. The Comerica loan, which was eventually secured in part with Jane Hart Trust assets, is one of the major issues in this litigation.

### C. *The 1992 Trust Amendment.*

Throughout the 1980's and early 1990's, Jane Hart Trust assets were used to make loans, or were pledged as security for loans, to, or at the request of, Hart family members,[7] even though the Jane Hart Trust Document did not authorize invasion of the Trust principal during Jane Hart's life. However, when Co–Trustee Counsel Briggs suggested that Co–Trustee Comerica accept Trust assets as security for the $2,500,000.00 Comerica loan to pay down HBL's debt to First Chicago, Comerica insisted upon specific Court approval of the transaction. Thus, Briggs, as Counsel to the Co–Trustees, drafted a Petition to Amend the Trust to permit the Co–Trustees to make loans and to permit Trust assets to serve as security for loans to, and for the benefit of, the Jane Hart Trust beneficiaries. Included in the Amendment were provisions which state that:

> The propriety of any such loan or security arrangement and the types of loans or

---

**3.** These invasions, also apparently for loans and pledges to and for Hart family members and friends, are not at issue.

**4.** The Court notes that Ann and Clyde Hart each receive annual compensation—apparently about $4000 a year—for fulfilling their duties as Co–Trustees of the Trust.

**5.** *See* fn. 29.

**6.** HBL's principal source of revenue was selling/leasing hotel safes in Hawaii. HBL was also a major investor in a failed marina project in the Bahamas. Plaintiffs claim that Briggs repeatedly misrepresented the amounts of profits that HBL made from the hotel safes, which in part induced the Co–Trustees to make loans to HBL.

**7.** Included in this group of loans is a December 1991 $50,000 loan made at the request of Cammie Conserva to her friend Barry Sackow, either directly or indirectly through HBL. This loan apparently remains unpaid and due, with principal and interest totalling $65,903.32.

security arrangements made shall be solely within the absolute discretion of the Co–Trustees ... [T]he Co–Trustees shall not incur any responsibility or liability as a result of any such loan or security arrangement, whether or not such loan or security arrangement constitutes an investment which may be legally made by the Trustee under any statute, rule of law, or otherwise.

The Co–Trustees, including Plaintiff Clyde Hart, signed the Amendment and the beneficiaries signed Consents to the Petition. The Probate Court, consistent with the Petition to Amend, entered a February 10, 1992 Order amending the Trust. Plaintiffs, however, now contend that the information in the Petition was inaccurate and false and that they were defrauded into signing it by Briggs and Comerica. Moreover, they claim that Prince later erroneously informed the Co–Trustees and the remainder beneficiaries that, when the Probate Court entered this Order, it knew of Comerica's conflict of interest in making loans based on pledged Trust assets.

On February 11, 1992, the Co–Trustees signed a Pledge and Limited Guaranty to secure the $2,500,000 Comerica loan to Jane Hart and Briggs for the HBL debt to First Chicago. Although Bronfman was obligated to First Chicago as an HBL Limited Partner, Jane Hart allegedly insisted that Bronfman not be obligated on the $2,500,000 Note to Comerica because she had previously provided substantial collateral for other HBL loans.[8] Besides Jane Hart Trust assets, Briggs also secured the Comerica loan with his own life insurance policies.

During this same period of time, Briggs, through Jane Hart's power of attorney and with the approval of the Co–Trustees, borrowed $45,000 from the Trust on behalf of

Jane Hart and allegedly deposited these funds into Jane Hart's checking account with Bryn Mawr Trust Company. Jane Hart claims that she did not know of or consent to this loan, apparently another instance of Briggs' alleged fraud.[9] Moreover, in June 1992, the Co–Trustees pledged Trust assets to secure a $650,000 Comerica loan to HBL, on which Briggs, Jane Hart, and Bronfman were each obligated.

### D. *The Loan Defaults.*

By mid–1993, HBL had, on several occasions, made late payments on the $2,500,000 Comerica loan. Comerica became concerned and met with Jane Hart, Bronfman, and Briggs to discuss the status of the loan. In early 1994, Bronfman became concerned herself, and contacted a financial advisor, Coleman Wortham. Wortham contacted Peter Partee, an attorney with Hunton & Williams, for assistance, and thereafter, Partee began representing Bronfman, Jane Hart, and arguably all of her children—the remainder beneficiaries.[10]

In May 1994, Jane Hart and Bronfman revoked the powers of attorney that they had given Briggs years earlier after meeting with Briggs, Clyde Hart, Wortham, and Partee in order to end the relationship between them and Briggs. Following the removal of Briggs, HB Holdings, a Virginia limited liability corporation wholly owned by Jane Hart and Bronfman, became HBL general partner. Wortham is the president of HB Holdings, Inc. and Partee is its counsel.

On May 31, 1994, several of the parties and their representatives held a meeting to discuss potential options for resolving the outstanding and delinquent $2,500,000 Comerica loan to Jane Hart and Briggs—in attendance

---

**8.** Now, however, Jane Hart apparently does not remember agreeing to be obligated on this loan and/or she claims that Briggs in some way mislead her about it or otherwise abused her power of attorney. Moreover, Clyde and Ann Hart contend that when they agreed to this pledge, they believed that Bronfman would also be obligated on the note—apparently another product of Briggs' alleged fraud.

**9.** Plaintiffs also claim that Briggs borrowed an additional $60,000.00 (approximately) from the Trust, allegedly on behalf of Jane Hart, without

the permission of Ann or Clyde Hart. Plaintiffs claim that Vasileff just simply gave Briggs the money and sought their approval afterward—allegedly something that he did frequently.

**10.** Plaintiffs argue that Mr. Partee is not the remainder beneficiaries' attorney, or at least was not their attorney during any time relevant to these proceedings. Mr. Partee, however, has refused to answer questions regarding his contacts with Plaintiffs, asserting attorney-client privilege.

were Clyde Hart, Ann Hart, Wortham, and individuals from Comerica's Lending and Trust Departments. At the meeting, they discussed various solutions for satisfying the loan, including: (1) a term note of 15 years paid directly from the trust income and (2) liquidation of trust assets. After the meeting, discussions continued, at which time Wortham and Partee rejected the proposal regarding the 15 year term note. In light of this, and out of respect for and obligation to their mother, Jane Hart, the Co–Trustees felt that their only option was to liquidate trust assets to pay down the loan. It should be reiterated that, pursuant to the Trust Document, the Co–Trustees had to approve, in writing, all activities related to making loans, securing loans, and liquidating assets.[11]

### E. *Probate Court Action.*

In September 1994, Vasileff, the Comerica Officer and Trust Executive assigned to the Jane Hart Trust, contacted Prince, the wife of his Comerica boss, Thomas Gormley, about doing some legal work on behalf of Comerica and the Trust, including (1) petitioning the Probate Court for allowance of annual accounts; and (2) petitioning the Probate Court to allow Comerica to be, despite its conflict, involved in liquidating Jane Hart Trust assets to satisfy the $2,500,000 loan to it. Vasileff provided her with the documentation necessary to perform these tasks and indicated to her that the Co–Trustees did indeed want to sell Trust assets to pay down the loan. In particular, Vasileff provided her with: (1) the February 10, 1992 Petition and Order which had amended the Trust, including the Consents for amending the Trust which had been signed by all beneficiaries and Co–Trustees; and (2) the $2,500,000 pledge agreement and limited guaranty which were signed by the Co–Trustees, incident to the Trust securing the loan. Prince believed at this time, and for at least one year thereafter, that she was the counsel of

record for the Trust and, accordingly, she periodically billed the Trust for, and was compensated for, various legal services ostensibly performed on behalf of it and the Co–Trustees.[12]

Incident to Vasileff's instructions and the documents he gave her, Prince prepared Petitions to the Wayne County Circuit Probate Court which: (1) sought entry of an Order allowing Comerica to participate in the liquidation, despite its conflict of interest as both the collecting loan holder and the Co–Trustee of the Trust; and (2) sought approval of: (a) the previously filed Trust Accountings between December 31, 1987 and June 30, 1993; (b) the Annual Accounting for July 1, 1993 through June 30, 1994; and (c) the $2,500,000 loan. Prince mailed copies of the Petitions, their attachments, and consent forms to the interested parties, including all of the beneficiaries, who in turn forwarded them to Wortham and Partee.

The beneficiaries, however, did not return the consent forms, and Partee informed Prince that they would not be forthcoming. Prince, in turn, either informed the Probate Court that the consent forms would not be forthcoming or the Probate Court knew as much since it had only unsigned Consents before it. Thereafter, the Probate Court provided a Notice of a December 14, 1994 hearing on the Petitions to all members of the Hart family.

No member of the Hart family or any of their representatives attended the hearing, even though they knew that much of the information and facts contained in the Petitions and Orders were erroneous. In fact, Prince had supplemented the initial Petitions due to several blatant errors in them. Nevertheless, at no time did anyone file any objections to the Petitions.

Thus, since Consents are not required under Michigan law, the Probate Court was persuaded that the Petitions were properly

---

**11.** The Plaintiffs, Co–Trustee Ann Hart, and the other remainder beneficiaries apparently claim that: (1) anything they signed with respect to the Amendment, the loans, the pledges, and the liquidation and (2) any investigation or actions that they failed to take were due to Briggs', Comerica's, and Prince's alleged fraud and misrepresentations about: (a) the management of the Trust;

(b) the consequences of the actions that the Co–Trustees were permitting or, (c) in the case of Comerica, otherwise engaging in; and (d) their legal rights and recourse.

**12.** *See* fn. 29.

in order and it granted them. Thereafter, 30 days before they were to be entered, Prince sent a copy of the proposed Orders approving the Petitions to all the interested parties, including the beneficiaries and their advisors. At no time did anyone file an objection to the proposed Orders. Thus, on January 9, 1995, the Probate Court entered Orders that approved the Accountings, and, on January 25, 1995, it entered an Order: (1) permitting Comerica to act despite the conflict and (2) permitting the sale of Trust assets to pay down the $2,500,000 Comerica loan to Jane Hart and Briggs. As discussed, this loan had, in turn paid off the First Chicago loan to HBL. At no time have Plaintiffs, or any other interested parties, ever attempted to re-hear, set aside, or appeal the Probate Orders or re-open the Accountings.[13]

With the Orders being entered and undisputed, Vasileff sent a proposal for liquidation of the Trust assets to Partee and Wortham. Wortham reviewed it and then proposed an alternative way to liquidate assets for better tax consequences. The Trust assets were eventually liquidated consistent with Wortham's recommendations.

On November 1, 1995, Plaintiffs filed, in Wayne County Probate Court, a Petition for the Removal of Comerica as the Corporate Co–Trustee and for Appointment of Special Co–Trustees to Pursue Claims against Comerica and Other Potential Defendants. In this Petition, Plaintiffs make substantially the same allegations that they have made in this case. Although Comerica has filed an Answer in the Probate Court, the proceedings have been stayed until further Order from the Probate Court.

### F. *Current Loan Status.*

Although the Trust sold assets to satisfy the $2,500,000 Comerica loan, $180,000 remains outstanding, and Briggs, Jane Hart, and presumably the Trust, remain obligated for this balance. Meanwhile, HBL is currently paid up on its $650,000 Comerica loan. Thus, no Trust assets have been used to pay down any portion of this debt. The status of the $45,000 and $60,000 loans to Jane Hart and the $50,000 loan to Cammie Conserva's friend, Barry Sackow, is left unresolved in the pleadings and depositions.

## III. *ANALYSIS*

### A. *Standards Applicable to Motions for Summary Judgment.*

To the extent that Defendants' various Motions are Motions for Summary Judgment, the Court notes that summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[14] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of princi-

---

**13.** Plaintiffs claim that even though they received Notices from the Probate Court, they did not know, due to Prince's malpractice, that they could appeal or re-hear these issues or that the failure of the beneficiaries to consent was inadequate to halt the proceedings.

**14.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

ples to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

**B. All of Plaintiffs' Claims, Except the Count II Malpractice Claims, and the Related Damages and Liability Claims in Counts VI and VIII, Are Barred by the Rooker–Feldman Doctrine.**

Plaintiffs' Counts I and III–IX each seek redress for various alleged injuries that they and the rest of the Hart Trust beneficiaries suffered incident to the Defendants' conduct regarding the loans that the Jane Hart Trust made or secured and the sale of its assets that paid down the $2,500,000 Comerica loan. Each of these alleged injuries, therefore,

grows out of the Probate Court Petitions and Orders that amended the Trust and approved: the Accountings, the $2,500,000 security pledge, the Comerica conflict of interest, and the consequent sale of Trust assets.

Essentially, instead of objecting to, or appealing, the Petitions or the Orders in the probate system or in the State system generally, Plaintiffs have chosen to redress their alleged injuries in this federal court, claiming, *inter alia,* fraud, misrepresentation, breach of fiduciary duty, and conversion. Thus, Plaintiffs are effectively asking this Court to review the actions of the Probate Court. Such a request, however, violates the *Rooker–Feldman* Doctrine.

**1. The Rooker–Feldman Doctrine: Its Basis, Inception, Meaning, and Consequence.**

■ The United States Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), taken together, stand for the proposition that the inferior federal courts lack the authority to perform, in effect, an appellate review of state court decisions. This now well-settled rule has become known as the *Rooker–Feldman* Doctrine and is based upon statutory construction and negative inference, the limited nature of the jurisdiction conferred upon federal courts by Article III of the United States Constitution, and the Constitution's bedrock principles of federalism and federal-state comity.

**a. The Statutory Considerations.**

Pursuant to the statutes which grant jurisdiction to the United States Supreme Court and to the federal district courts, Congress has created a jurisdictional scheme which demands that the inferior federal courts not review the decisions of state courts.

■ 28 U.S.C. § 1257 grants the Supreme Court the right to review "[f]inal judgments ... rendered by the highest court of a State in which a decision could be had." Thus, because Congress has not granted any other federal court the right to review state

court judgments, the Supreme Court's jurisdiction under § 1257 is exclusive. Furthermore, because 28 U.S.C. §§ 1331 and 1332 only grant original jurisdiction to the inferior federal courts, they may not engage in appellate review of state decisions.

The jurisdictional boundaries set up by these statutes are further enforced by Article III and the constitutional principles of federalism and federal-state comity.

### · b. *Constitutional and Federalism Concerns.*

■ Article III provides, in relevant part, that

> [t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish ... The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and ... to Controversies between Citizens of different States....

Thus, the federal courts are courts of limited jurisdiction whose jurisdiction Congress may limit, but not expand. *See, Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This is exactly what Congress has done in 28 U.S.C. §§ 1257, 1331, and 1332. Implicit in these statutes is the recognition that the whole of state litigation should not be displaced into federal courts and that the two separate legal systems in this country— state and federal—cannot function but for these limitations since they would otherwise compete for control of a particular case and/or its interrelated issues. *See, Lynk v. LaPorte Superior Court No. 2,* 789 F.2d 554, 563 (7th Cir.1986); *Texaco v. Pennzoil,* 784 F.2d 1133, 1142 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). This recognition, therefore, is grounded in the federalism and federal-state comity which underlies our Nation's Constitution and our dual system of State and federal government.

### c. *The Seminal Supreme Court Cases and Their Progeny.*

As noted above, the relevant issues of statutory construction, limited federal court jurisdiction, and federalism and federal–State comity were first recognized and applied by the Supreme Court in *Rooker* and *Feldman.*

In *Rooker,* the plaintiffs brought an action in a federal district court claiming that an Indiana state statute violated their federal constitutional rights, even though the issues which the plaintiffs raised had been decided by an Indiana Circuit Court and affirmed by the Indiana Supreme Court. In affirming the federal district court's dismissal of the action based on lack of jurisdiction, the U.S. Supreme Court stated that the state courts had jurisdiction to determine the constitutional validity of the state's statutes and, until reversed or modified by a state court, the state judgment would be an effective and conclusive adjudication, even before an inferior federal court. 263 U.S. at 415, 44 S.Ct. at 150. In particular, the Court held that the inferior federal courts lacked jurisdiction to entertain a proceeding to reverse or modify a state court judgment since it would be an exercise of appellate jurisdiction and the jurisdiction possessed by the federal district court is strictly original. *Id.* at 414–17, 44 S.Ct. at 149–51.

In *Feldman,* the plaintiff submitted to the District of Columbia Court of Appeals a petition for admission to the bar of the District of Columbia after he had been refused the right to take the bar examination because he had not graduated from an approved law school, as required by the District of Columbia rules. After the District of Columbia Court of Appeals denied the plaintiff's petition, he brought an action in a federal district court alleging that he had a right to take the bar exam pursuant to the Fifth Amendment, and that, denying him this right, due to his law school's lack of accreditation, was a violation of the Fifth Amendment and the Sherman Act. In finding that the federal district court had no jurisdiction over this matter, the U.S. Supreme Court held that plaintiffs seeking review of state court decisions must first exhaust the appellate review available to them at the state court level and then, they may appeal only to the United States Supreme Court. *Feldman,* 460 U.S. at 486, 103 S.Ct. at 1316–17.

Since these decisions, the U.S. Courts of Appeal and the U.S. Supreme Court have stated broadly that when presented with claims that raise issues which were the subject of, or inextricably intertwined with, state court decisions, the inferior federal courts must apply the *Rooker–Feldman* Doctrine and dismiss the claims, even where the inextricably intertwined issues underlying the claims before it were not raised in state court, or where the time for appeal in the state court system has expired. *See, e.g., Garry v. Geils,* 82 F.3d 1362, 1369–70 (7th Cir.1996). Put simply, claims like these are barred from the inferior federal courts because these courts have no authority to review state court decisions or any issues that either the state court or the parties considered or raised, or could have, in the course of the state court decisions. *Id.*

Thus, as the Court discusses below, an inferior federal court must apply the *Rooker–Feldman* Doctrine to dismiss cases for lack of jurisdiction where: (1) the party against whom the Doctrine is being applied had the opportunity to raise the issues before the inferior federal court, or those inextricably intertwined therewith, in prior state court proceedings;[15] and (2) the prior state court proceedings adjudicated the issues before the inferior federal court or the issues before the federal court are inextricably intertwined with the issues which were the subject of the prior state court proceedings.

### 2. *The "Parties" to the Prior State Court Proceedings for Rooker–Feldman Purposes.*

The Sixth Circuit has held that to apply the *Rooker–Feldman* Doctrine to bar a plaintiff's claim, the court must find that the plaintiff was a "party" to the underlying state court proceedings. *United States v. Owens,* 54 F.3d 271, 274 (6th Cir.1995) (*Rooker–Feldman* does not apply to bar a suit in a federal court *brought by a party* that was not a party in the preceding action in state court, nor does it *bar* a party against whom there is no state court judgment (*emphasis* added)). In *Owens,* the Sixth Circuit held that a plaintiff would be deemed to be a party for *Rooker–Feldman* purposes where (1) he or she had the opportunity to raise his or her claims in the state court proceedings and (2) where failure to do so would impact detrimentally on his or her legal rights and interests. *Id.* at 274. The Court's rationale for this rule was that, because *Rooker–Feldman* bars appellate review of state court judgments, "a party cannot be said to be appealing a decision by a state court when it was not a party to the case." *Id.* The clear import of the *Owens* decision, therefore, is that only the plaintiff, and not the defendant, need be a party to the prior state court proceeding in order for *Rooker–Feldman* to apply because the focus is whether the federal plaintiff is attempting to re-litigate the subject of an existing state court judgment or the issues inextricably intertwined therewith. The alignment or designation of the parties in the state court action is not relevant provided that the federal plaintiff is essentially "appealing" or attempting to re-litigate an already resolved state court judgment.[16]

The instant Plaintiffs, as they conceded at the hearing, were parties to the prior Wayne County Probate Court proceedings because they had the opportunity to intervene in those proceedings and doing so

---

**15.** The Court has found no controlling or persuasive authority for the proposition that the defendant in who's "favor" the *Rooker–Feldman* Doctrine is being applied must also have been a "party" to the prior state court proceeding. The Court notes that this observation is consistent with its holding in *Kevorkian v. Thompson,* 947 F.Supp. 1152, 1997 WL 3291, *13–14 (E.D.Mich. 1997) (To be reported at 947 F.Supp. 1152), where the Court refused to apply the *Rooker–Feldman* Doctrine to one of the plaintiffs who was not a party to the prior state court proceedings, relying on the Sixth Circuit's decision in *Owens. See* discussion, *infra.* Nevertheless, as the Court discusses *infra,* even if *Rooker–Feld-*

*man* requires this, it would not be a bar to applying *Rooker–Feldman* to all of Plaintiffs' claims in Counts I and III–IX, except those claims in Counts VI and VIII which are related to the claims in Count II, because the Court finds that Defendant's were "parties" to the probate court proceedings for *Rooker–Feldman* purposes.

**16.** The Court notes that *Rooker–Feldman* is broader than *res judicata* and, in this instance, is more like collateral estoppel because the Doctrine's effect is both claim and issue preclusion. *See* discussion at III.B.5, *infra.*

was necessary to preserve their rights. *Cf. Owens,* 54 F.3d at 274 *with Raseman v. Raseman,* 234 Mich. 237, 242, 208 N.W. 35, 37 (1926) (the allowance of annual accounts of testamentary trustees on notice is made by statute final and binding upon all parties in interest) *and James v. Gerber Products Co.,* 587 F.2d 324, 327–29 (6th Cir.1978) ("if a party in interest has a complaint with a trustee accounting, the party should object to the allowance of the accounting during the probate hearing ... [because] the hearing is designed to adjudicate all claims relating to the complete range of trustee misconduct, and the allowance is intended to settle all rights of the parties in interest ...").

▋ Nevertheless, Plaintiffs contend that should *Rooker–Feldman* apply to this case, it should only bar its claims against Comerica [17] because none of the other Defendants were parties to the proceedings before the Probate Court. As discussed above, the Court doubts that this is of significance in light of the *Owens* decision. However, even if *Owens* is read to require that Defendants be "parties," the Court finds that the breadth of the Accountings, and the Probate Court's attendant jurisdiction, is enough to make the Defendants "parties" to the Probate Court proceedings for *Rooker–Feldman* purposes.[18]

The Michigan probate statute states that:

(1) The probate court has exclusive jurisdiction of proceedings initiated by interested parties concerning the *internal affairs of all trusts.* Proceedings which may be maintained under this section are *those concerning the administration and distribution of a trust,* the declaration of rights, and *the determination of other matters involving trustees and beneficiaries of a trust. These include proceedings:*

(c) ... *to determine any question arising in the administration or distribution of any trust* including questions of construction of trust instruments ... and *to determine the existence or nonexistence of any immunity, power, privilege, duty, or right.*

M.C.L.A. 700.805 (*emphasis* added). Moreover, M.C.L.A 700.21 provides that the probate court has

*exclusive legal and equitable jurisdiction of all of the following:* ... (b) *Proceedings concerning the validity, internal affairs, and settlement of trusts, the administration, distribution, modification, reformation, and termination of trusts, and the declaration of rights involving trusts, trustees, and beneficiaries of trusts,* including, but not limited to, the following proceedings to (iii) Require, hear, or settle interim or final accounts ... (v) *Determine any question arising in the administration or distribution of any trust,* including questions of construction of wills and trusts; instruct trustees, and *determine relative thereto the existence or nonexistence of an immunity, power, privilege, duty or right ....*

(*emphasis* added).

The Court finds that the clear import of these provisions is that if the Co–Trustees or the beneficiaries wished to bring, incident to the Probate Court Accountings, a claim for fraud, conversion, breach of fiduciary duty, or misrepresentation against the Co–Trustees and/or the Counsels to the Co–Trustees regarding the management of the Trust, it could have and should have. Thus, given the *Owens* focus on the mere opportunity for an issue to have been litigated and/or what was necessary to preserve a plaintiff's rights [19], as well as its concern about the appeal or re-

**17.** Comerica, as a Co–Trustee, was by definition a party to the Probate Court proceedings.

**18.** This finding, however, does not prevent Plaintiffs from litigating their malpractice claims in federal court. *See* discussion at section III.C.1.b of this Opinion, *infra.*

**19.** The Court notes that all of the Defendants have made serious and meritorious *res judicata* challenges to Plaintiffs' claims as a matter of probate law because Plaintiffs knew of the al-

leged fraud, misrepresentation, breaches of fiduciary duty, and conversion in Spring 1994 and failed to take any action. *See, In re Estate of Humphrey,* 141 Mich.App. 412, 428–30, 367 N.W.2d 873 (1985); *Banks v. Billups,* 351 Mich. 628, 635, 88 N.W.2d 255, 259 (1958); *McDannel v. Black,* 270 Mich. 305, 310–13, 259 N.W. 40 (1935). However, to the extent that these challenges are serious, they are not serious with respect to the malpractice claims. *See* discussion at III.C.1.b, *infra.*

litigation of state court proceedings, the Court would find alternatively that, under *Owens*, all of the Defendants are properly considered parties to the prior Probate Court Proceedings.

Thus, having found that Plaintiffs, and in the alternative Defendants as well, were parties to the prior Probate Court proceedings, the Court must apply the *Rooker–Feldman* Doctrine to Plaintiffs' claims if they were the subject of or were inextricably intertwined with the prior Probate Court proceedings.

### 3. All of Plaintiffs' Claims, Except Those for Legal Malpractice, Are Inextricably Intertwined with the Prior State Court Decisions.

■■■ Plaintiffs' Complaint alleges various counts of fraud, misrepresentation, breach of fiduciary duty, conversion, exemplary damages, and vicarious liability arising from the loans, pledges of security, amendment, and liquidation related to the management of the Jane Hart Trust. These Trust management issues, however, were precisely the issues which were the subject of the Probate Court's Orders on February 10, 1992, January 9, 1995, and January 25, 1995, and all related Petitions, Consents, and Notices.[20] Indeed, had the Probate Court not granted these Petitions or entered these Orders, or if Plaintiffs had successfully raised their various arguments on appeal or in a re-hearing, the Plaintiffs would have no basis for their Complaint before this Court—except, potentially, their malpractice claims. Thus, most of Plaintiffs claims in this case are nothing more than an attempt to attack collaterally the Orders of the Probate Court.

■■ Any attack on these Orders, however, should have been in the form of an appeal or petition in the probate court system or the state court system generally.[21] It should not, nor can it be, a matter for this Court, given its limited jurisdiction and inability to act as a court of appeal for the Probate Court's Orders. Accordingly, Plaintiffs' Counts I and III–IX must be dismissed for lack of jurisdiction, except those portions of Counts VI and VIII, exemplary damages and respondeat superior, respectively, which are related to the malpractice allegations in Count II.[22] The Court separates the Count II malpractice claims for the reasons discussed at section III.C.1.b of this Opinion.

Before proceeding, the Court feels compelled to observe that, although Plaintiffs here are clearly responsible for the ramifications of the operation of the *Rooker–Feldman* Doctrine and the consequent fact that they will not have the opportunity to litigate their claims against Comerica in federal court, the manner in which Comerica discharged its fiduciary obligations to the Trust, the Co–Trustees, and the beneficiaries is very disturbing. The self-serving and unprofessional conduct of Comerica and its officers in paying itself off out of Trust assets, to the detriment of the Trust's beneficiaries, and using the wife of a Comerica officer as the Trust's counsel to do this without disclosing the relationship to all involved is deeply troubling. The callous indifference that the fiduciaries at Comerica showed to the beneficiaries' interests and rights should, at the least, be the subject of internal investigation and redress within the institution. Although Plaintiffs will, presumably, receive no benefit from this, Comerica should itself review its procedures to insure that others to whom it

---

**20.** The Court observes that there is no dispute that Plaintiffs received notice of the Probate Court's proposed actions and had a full and fair opportunity to contest these actions in the Probate Court both before it issued its orders and after, through request for reconsideration or appeal.

**21.** The Court notes that this is apparently what Plaintiffs attempted to do a month and a half prior to their instant Complaint, when they filed, in Wayne County Probate Court, a "Petition to Remove Comerica Bank as Corporate Trustee, to Appoint a Successor Corporate Trustee, to Ap-

point Special Co–Trustees to Conduct All Matters Regarding the Claims of the Trust against Comerica Bank as Corporate Co–Trustee, and Other Potential Defendants and for Partial Supervision of the Trust Proceedings."

**22.** Having dismissed Counts I and III–IX, except those portions of Counts VI and VIII related to Count II, the Court finds that the various cross-claims, counter-claims, and Third Party Complaints are moot as they all flow from Counts I and III–IX.

serves as a fiduciary are not treated with the same cavalier disregard.

#### 4. *Other Issues that Plaintiffs Have Raised Regarding Rooker–Feldman.*

Before leaving the *Rooker–Feldman* issues, the Court will address Plaintiffs' other challenges to the applicability of the Doctrine.

#### a. *Rooker-Feldman Applies to All Matters before an Inferior Federal Court which Were the Subject of or Inextricably Intertwined with Prior State Court Judgments, Not Just Those which Raise Federal Questions.*

▆▆ Plaintiffs have argued that *Rooker–Feldman* only applies to cases which are brought before an inferior federal court pursuant to federal question jurisdiction, and not to cases, like the instant matter, which are brought pursuant to diversity jurisdiction. While the Court does note that, when courts apply the *Rooker–Feldman* Doctrine, typically the plaintiffs are alleging, before the inferior federal court, violations of their federal rights or violations of federal statutes, this is of no legal significance to the applicability of the Doctrine. *See, e.g., Kamilewicz v. Bank of Boston Corp.,* 92 F.3d 506, 509–12 (7th Cir.1996) (applying *Rooker–Feldman* to claims of common law fraud, negligent misrepresentation, attorney malpractice, breach of fiduciary duty, and conversion); *Powell v. Powell,* 80 F.3d 464, 467 (11th Cir.1996) (the plaintiff argued that *Rooker–Feldman* only concerns subject matter jurisdiction in cases where direct review is sought of a state court's decision involving state law; the 11th Circuit disagreed, finding that "[n]either this Court nor the [U.S.] Supreme Court has limited the scope of the *Rooker–Feldman* [D]octrine to [only] state court judgments based solely on state law").

Indeed, it is clear that, as a matter of federalism and federal-state comity, the argument for applying the *Rooker–Feldman* Doctrine to diversity cases is even stronger, since, in such an instance, the inferior federal court would otherwise be acting as a court of appeal over state court decisions about state law. Thus, the Court finds that *Rooker–Feldman* applies to all issues raised in a federal court—federal causes of action, constitutional rights, probate issues, or otherwise—which were the subject of, or inextricably intertwined with, prior state court judgments. In particular, the Court concludes that this application is appropriate because the *Rooker–Feldman* Doctrine itself is about the proper jurisdiction of a federal court in a federalist system that values and recognizes federal-State comity. Accordingly, the Court finds Plaintiffs' argument unpersuasive.

#### 5. *Ordinary Res judicata Principles Are Not Relevant to the Applicability of the Rooker–Feldman Doctrine.*

▆▆ Plaintiffs further argue that the *Rooker–Feldman* Doctrine should not bar them from litigating their claims before this Court because they have not previously litigated them in another court. Essentially, then, they argue that they have not had a full and fair opportunity to litigate their claims for *res judicata* purposes.

▆▆ It is important to note that, in its preclusive effect, *Rooker–Feldman* is analogous to, but not identical to, *res judicata,* in part because it is a mixture of both *res judicata* and abstention, including both claim and issue preclusion. For instance, as it applies to this matter, the Court observes that unlike *res judicata, Rooker–Feldman* is "entirely federal and requires no reference to principles of state law." *Garry,* 82 F.3d at 1367 n. 8; *See also, Pirela v. Village of North Aurora,* 935 F.2d 909, 911 (7th Cir.) *cert. denied,* 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). Moreover, because *Rooker–Feldman* applies to issues which were merely inextricably intertwined with state court decisions, a court applying *Rooker–Feldman* does *not,* unlike a court applying *res judicata,* look to whether the party against whom it is being raised has had a full and fair opportunity to pursue its claim in the previous state court proceeding or whether state law would allow reconsideration of the previously decided claims or issues. *Garry,* 82 F.3d at 1367; *See also, Pirela,* 935 F.2d at 911. As a result, "impermissible appellate review may occur when a district court is asked to entertain a claim

that was not even argued in the state court but is [still] 'inextricably intertwined' with the state court judgment." *Ritter v. Ross,* 992 F.2d 750, 753 (7th Cir.1993) (quoting and citing *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. at 1316 n. 16).

▋ Thus, whether or not Plaintiffs' claims would be barred by *res judicata* as a matter of state law or otherwise is irrelevant to the Court's application of the *Rooker–Feldman* Doctrine to this case. Further, this distinction between *Rooker–Feldman* and *res judicata* principles is supported by the respective consequences of their application. Dismissal on *Rooker–Feldman* grounds is, although with prejudice, considered only a dismissal on jurisdictional grounds. *Cf. Amrit Lal v. Borough of Kennett Square,* 935 F.Supp. 570, 575 (E.D.Pa. 1996), *with Feldman,* 460 U.S. at 476, 103 S.Ct. at 1311–12 *and Rooker,* 263 U.S. at 415–16, 44 S.Ct. at 150. Dismissal on *res judicata* grounds operates as a decision on the merits.

### C. Plaintiffs' Malpractice Claims.

#### 1. The *Malpractice Claims Against Briggs and Miro.*

In Count II of their Amended Complaint, Plaintiffs allege that Briggs and Miro, as his employer, were negligent in their legal representation by at least the following:

*Briggs* :

(1) Briggs engaged in self-dealing by abusing Jane Hart's Power of attorney to advance his personal interests, instead of the interests of the Trust and its beneficiaries; (2) Briggs failed to keep the individual Co-Trustees (Clyde and Ann Hart) informed of the risks of the transactions undertaken on behalf of the Trust by Briggs; (3) Briggs violated Michigan Rule of Professional Conduct ("MRPC") 1.7(b) because his representation of the Co–Trustees was materially limited by his own interests; (4) Briggs violated MRPC 1.16(a) by failing to withdraw as Counsel for the Co–Trustees; (5) Briggs violated MRPC 1.16(a) by failing to explain matters to the individual Co-Trustees to the extent reasonably necessary to permit them to make informed decisions regarding the representation; (6) Briggs violated MRPC 8.4 by engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation; (7) Briggs failed to exercise reasonable care in acting as the attorney for the Co–Trustees of the Trust; and (8) Briggs failed to avoid the appearance of impropriety.

*Miro:*

(1) Miro violated MRPC 5.1(a) by failing to make reasonable efforts to ensure that Briggs conformed to the MRPC provisions.

#### a. The Court Has Diversity Jurisdiction over this Matter.

Briggs and Miro have filed a Motion to Dismiss in which they argue that the Court has no diversity jurisdiction over this matter. Specifically, Briggs and Miro claim that, to the extent that Plaintiffs purport to assert claims on behalf of the Trust, they are imputed with the citizenship of all three Co–Trustees—including Comerica's Michigan citizenship—and to the extent they also purport to bring claims on behalf of the remainder beneficiaries, they are imputed with the citizenship of all eight of them—including Michael Hart's Michigan citizenship.

Having already dismissed all of Plaintiffs' Counts, except for Count II and the related parts of Counts VI and VIII, Briggs and Miro's Motion to Dismiss for lack of diversity jurisdiction remains "alive" to the extent which it asserts that the Court lacks diversity jurisdiction over Plaintiffs' malpractice claims in Count II and the damages and liability allegations in Counts VI and VIII.

**i. The citizenship of Clyde Hart, as a Co–Trustee Suing on Behalf of the Trust and the remainder beneficiaries, is not determined by reference to the Trust's "citizenship" or to the "collective citizenship" of the remainder beneficiaries.**

Briggs and Miro contend that there is no diversity of citizenship in this case because Clyde Hart, as a Co–Trustee, is suing on behalf of the Trust and the remainder beneficiaries so that the citizenship of the Trust and the collective citizenship of the remainder beneficiaries each vis-a-vis the citizenship

of Defendants is the point of inquiry for diversity jurisdiction purposes. This assertion, simply put, has no basis in law.

▇▇▇▇ Fed.R.Civ.P. 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, *trustee* of an express trust ... may sue in that person's own name without joining the party for whose benefit the action is brought [23] ...." (*Emphasis* added). Thus, because Clyde Hart need not join the party or parties for whose benefit his action is brought, the "citizenship" of the Trust and the "collective citizenship" of the remainder beneficiaries is irrelevant to his claim.[24] *See, e.g., Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980) (trustee may bring a diversity action in the trustee's own name based on the citizenship of the trustee because the trustee is the real party in interest and federal courts rest their jurisdiction only upon the citizenship of real parties to a controversy).

### ii. Cammie Conserva has a claim for malpractice so that only her own citizenship is relevant.

With respect to Cammie Conserva, Briggs and Miro claim that she does not have standing to bring a lawsuit against them for malpractice because she was not Briggs' client. Alternatively, even if the Court finds she may maintain a malpractice claim against them, Briggs and Miro argue that the Court is without diversity jurisdiction since her claim must be on behalf of the remainder beneficiaries with whose collective citizenship she is imputed.

The Michigan Supreme Court, consistent with many other courts, has recently held that a beneficiary of a will may maintain an action as a third-party beneficiary against a lawyer for breach of contractual obligations owed the testator by the lawyer. *Mieras v. DeBona,* 452 Mich. 278, 289, 550 N.W.2d 202, 207 (1996).

In *Mieras,* decedent Nita Ledbetter Jackson had, prior to her death, signed a new will disinheriting her daughter Juanita Neville, and dividing her estate between her other children, Ruth Ann Mieras and Elmer E. Ledbetter. 452 Mich. at 281, 550 N.W.2d 202. However, due to attorney error, the new will did not exercise a general power of appointment conferred on Jackson under the terms of a marital trust established for Jackson's benefit by her husband, Ellsworth C. Ledbetter, the father of the three children. *Id.* Thus, in default exercise of the power, Neville was entitled to one-third of the corpus of the trust upon Jackson's death. *Id.*

In finding that Mieras and Ledbetter could maintain causes of action sounding in malpractice against the attorney, the Michigan Supreme Court held that a beneficiary named in a will could sue the attorney who drafted the will for malpractice regarding the will, even though the beneficiary did not have an attorney-client relationship with the attorney. *Id.* at 289, 550 N.W.2d 202. In particular, the Court found that the beneficiary could maintain this professional malpractice suit because the beneficiary had the same interests as the testator with respect to the drafting of the will and the attorney had a duty to the beneficiary that was contractual in nature emanating from the third-party beneficiary contract doctrine. *Id.*

It is important to note that Mireas' and Ledbetter's causes of action were independent and separate of each other and of the other beneficiary, Neville. Moreover, the Michigan Supreme Court quoted approvingly the statement in the prior decision in the case where the Michigan Court of Appeals said that it found that "an examination of decisions in other jurisdictions reveals a trend toward imposing attorney liability to non-clients who are harmed by the attorney's negligence in performing professional duties" and that "the defense of a lack of privity had been eliminated by [the Michigan Supreme

---

**23.** The Court notes that the plain language of Fed.R.Civ.P. 17(a) disposes of Miro's assertion that the Trust is an indispensable party such that this lawsuit cannot proceed without it.

**24.** The Court notes that, to the extent that Cammie Conserva is a "joined party," she is asserting her own claim as a beneficiary, and that her citizenship does not defeat diversity as she is a citizen of Connecticut.

Court] in some professional negligence situations and ... [that the Court] had adopted 'a rule of liability to foreseeable relying third parties.' " *Id.* at 283, 550 N.W.2d 202 (quoting *Mieras v. DeBona*, 204 Mich.App. 703, 707, 516 N.W.2d 154 (1994) (citations omitted)).

 The Court, persuaded · by this reasoning, finds that Cammie Conserva, as a third party beneficiary to the Jane Hart Trust, may maintain a cause of action—independent of the Co–Trustees and the other remainder beneficiaries—against the lawyers to the Trust and its Co–Trustees since her interests are consistent with those of the Trust and the Co–Trustees—the defense and health of the Trust—and because she is a foreseeable and known relying third-party beneficiary of any legal work done on behalf of the Trust or the Co–Trustees regarding the management of Trust assets. Indeed, the Court has found that she was a party to the Probate Court proceedings in which the various counsels performed the underlying legal work.

 Accordingly, the Court holds that Cammie Conserva, as a party to the Probate Court litigation and a known and foreseeable third-party beneficiary of the legal work performed for the Trust and the Co–Trustees, is a proper malpractice plaintiff against Prince, Briggs, and Miro. Moreover, having so found, the Court further finds that it has diversity jurisdiction over her claims as she is a citizen of Connecticut and the Defendants are Michigan citizens.

**b.** *Plaintiffs' malpractice claims against Briggs, Miro, and Prince are not barred by res judicata, collateral estoppel, or the Rooker–Feldman Doctrine.*

In their Motion for Summary Judgment, Briggs and Miro argue that all of Plaintiffs' claims, including malpractice, should be dismissed because they are barred by *res judicata* or collateral estoppel. Thus, since the Court has instead dismissed Counts I and III–IX pursuant to the *Rooker–Feldman*

Doctrine, the Court will consider whether *res judicata,* collateral estoppel, or the *Rooker–Feldman* Doctrine bar the malpractice claims.

**i. Plaintiffs' Malpractice Claims Are Not Barred by *Res judicata* or Collateral Estoppel.**

 Legal malpractice is inherently a separate and independent cause of action that arises from a legal dispute which is often already disposed of—by *Rooker–Feldman, res judicata,* collateral estoppel, summary judgment, jury verdict, lack of jurisdiction, or otherwise. *See, United States v. 7108 West Grand Avenue,* 15 F.3d 632, 632–33 (7th Cir.1994); *In re Sumpter Estate,* 166 Mich. App. 48, 55, 419 N.W.2d 765, 769 (1988); *In re Powell Estate,* 160 Mich.App. 704, 712–14, 408 N.W.2d 525, 529–30 (1987); *In re Green Charitable Trust,* 172 Mich.App. 298, 326–27, 431 N.W.2d 492, 504 (1988); *Wisdom v. Neal,* 568 F.Supp. 4, 6 (D.N.M.1982); *See also, Darr v. Schroer, Rice, Bryan & Lykins,* 1989 WL 47087 (D.Kan.1989) (unpublished); *Georgou v. Fritzshall,* 1994 WL 685065 (N.D.Ill. 1994) (unpublished). Thus, it is a *non sequitur* to assert that a plaintiff is barred from pursuing a legal malpractice claim against his or her lawyer because the subject matter of the representation which produced the malpractice has been resolved.[25]

**ii. Plaintiffs' Malpractice Claims Are Not Barred by the *Rooker–Feldman* Doctrine.**

Defendants Briggs, Prince, and Miro argue further that Plaintiffs' malpractice claims are barred by *Rooker–Feldman* because they are inextricably intertwined with the proceedings before the Probate Court. For this proposition, these Defendants rely on the Seventh Circuit's decision in *Kamilewicz v. Bank of Boston Corp.,* 92 F.3d 506 (7th Cir.1996), where the Court affirmed the district court's dismissal of, *inter alia,* the plaintiffs' fraud, conversion, misrepresentation, breach of fiduciary duty, and attorney malpractice claims pursuant to the *Rooker–Feldman*

**25.** This holding should, in no way, be considered a determination about whether or not Plaintiffs' fraud, misrepresentation, breach of fiduciary

duty, and conversion claims are barred by *res judicata* or collateral estoppel as a matter of probate law. *See* fn. 26, *infra.*

Doctrine. In *Kamilewicz*, the plaintiffs filed the fraud, conversion, misrepresentation, breach of fiduciary duty, and legal malpractice claims against the attorneys who represented them in a class action where they paid $91.33 in attorney fees to recover $2.19 on the merits. 92 F.3d at 508. The Court justified applying the *Rooker–Feldman* Doctrine to bar the malpractice claims since the prior state court proceedings included a fairness hearing on the settlement and the attorneys fees. *Id.* at 508–511. Thus, it could be fairly concluded that the plaintiffs were mounting a collateral attack on the prior state court judgment since, inherent in the fairness hearing proceeding was the question of the efficiency and value of the attorneys' services. Obviously, the facts of the instant matter are much different.

■■■ The Accountings regarding the Jane Hart Trust were in no way a judgment regarding the fairness, appropriateness, or competency of the legal representation of Briggs, Miro, and Prince. Rather they were focused on the management of the Trust and its assets. Thus, the Court cannot say that Plaintiffs are collaterally attacking the Probate Court decisions by raising issues—their malpractice claims—which were the subject of the prior Probate Court proceedings. Neither can the Court say that the malpractice claims were inextricably intertwined with the Probate Court proceedings because, even if the Probate Court had not approved the Accountings, Plaintiffs would still have separate injuries from and causes of action for malpractice.[26] In particular, the Probate Court's entertaining jurisdiction over the administration of the Trust cannot mean that Plaintiffs had to raise their malpractice claims there because an attorney's malpractice regarding a matter before a court is inherently something that is separate and independent from the underlying matter itself. *7108 West Grand Avenue*, 15 F.3d at 632–33.

In *7108 West Grand Avenue*, the husband and wife plaintiffs, due to malpractice on behalf of their lawyers, moved for relief from a forfeiture judgment against their real property which the Government alleged had been acquired with proceeds from the husband's drug business. In denying plaintiffs relief from the judgment, the Seventh Circuit stated that "[m]alpractice, gross or otherwise, may be a good reason to recover from [a] lawyer but does not justify prolonging [the original] litigation...." *Id.* Thus, the Court concluded that appropriate relief for the plaintiffs was a malpractice claim, not relief from the forfeiture judgment.

The situations in *7108 West Grand Avenue* and in the instant matter, therefore, are unlike *Kamilewicz*, where the malpractice—which was the discrepancy between the fees and the recovery—was the very subject matter of the prior state court proceeding. In light of this distinction, therefore, and given the inherent separate and independent nature of a malpractice claim, the Court concludes that Plaintiffs' malpractice claims were not the subject of or inextricably intertwined with the prior Probate Court proceedings. Accordingly, the Court finds that Plaintiffs' malpractice claims are not barred by the *Rooker–Feldman* Doctrine.

**c. There Exists a Material Question of Fact Regarding the Existence and Scope of Briggs' Alleged Agency with Miro.**

In their Amended Complaint, Plaintiffs allege that Miro, under the theory of *respondeat superior*, is liable for Briggs' alleged malpractice because he is "Of Counsel" at the Miro law firm. In its Motion for Summary Judgment, Miro contends that since Briggs is not its agent, it cannot be held liable for his alleged malpractice. Moreover, Miro states that even if Briggs was its agent, it is not liable for his acts in this case, which, as alleged, constitute intentional torts.

**i. The law of agency controls Plaintiffs' malpractice claims against Miro.**

■■■ The liability of a law firm for the malpractice of a lawyer involved with the

---

**26.** The Court, therefore, is distinguishing the malpractice claims from the fraud, misrepresentation, breach of fiduciary duty, and conversion claims because the latter claims go to the administration of the Trust and its assets and the right and duties that flow from the Trust document whereas the former claim goes to the adequacy of the legal representation that the Co–Trustees and the remainder beneficiaries received pursuant to their attorney-client relationships.

firm is a matter of agency. *See, e.g., Hayden v. Green,* 166 Mich.App. 352, 356, 420 N.W.2d 201, 203 (1988). In *Hayden,* the plaintiff retained defendant Phillip Green of the law firm Colista, Green, Green & Adams ("CGG & A") to represent him in an employment discrimination action against Chrysler Corporation in federal district court. *Id.* at 352, 420 N.W.2d 201. In the Court's Order in favor of the plaintiff, the Court directed the parties to submit to it within 15 days an amount agreed upon for the plaintiff's back pay. If the parties could not agree, they were to inform the Court within 20 days, at which time the Court would fix the amount upon submission of documentation. *Id.*

However, because no agreement was reached and the plaintiff subsequently failed to submit the requested documentation, the Court dismissed the plaintiff's judgment on April 16, 1980. *Id.* Unbeknownst to the plaintiff, Green left the firm on June 1, 1980 to open his own office. *Id.* After being unable to contact Green and learning that his judgment had been dismissed, the plaintiff eventually found Green and had Green represent him in his unsuccessful appeal of the dismissal to the Sixth Circuit. *Id.* The plaintiff's malpractice action against Green and CGG & A followed in November 1982.

▮ In discussing the accrual date for the action against the law firm for statute of limitation purposes, the Michigan Court of Appeals noted that CGG & A's liability for Green's malpractice was based on agency principles. *Id.* at 356, 420 N.W.2d 201. Thus, to determine if Miro is liable for Briggs' alleged malpractice, the Court will look to agency principles. At the outset of this analysis, the Court notes that it is well-established that "[a]ny question relating to the existence and scope of an agency relationship is a question of fact." *See, e.g., Hertz Corporation v. Volvo Truck Corporation,* 210 Mich.App. 243, 246, 533 N.W.2d 15, 17 (1995).

▮ Under agency law, "it is well-settled that a principal is responsible for the acts of its agents done within the scope of the agent's authority." *Dick Loehr's, Inc. v. Secretary of State,* 180 Mich.App. 165, 168, 446 N.W.2d 624, 626 (1989). Implicit in this find-ing of responsibility, therefore, is an initial finding that an agency relationship existed between the alleged principal and the alleged agent.

▮ In Michigan, consistent with most other States, "[t]he test of whether an agency has been created is whether the principal has a right to control the actions of the agent." *Meretta v. Peach,* 195 Mich.App. 695, 491 N.W.2d 278, 280 (1992) (citations omitted). Generally, courts will look to a host of factors in determining whether or not this "control" exists. These factors typically include:

> (1) whether the alleged principal provided the materials and place of work for the alleged agent;

> (2) whether the alleged agent, independent of the alleged principal, offers his services to the public at large;

> (3) whether the alleged principal has the right to terminate the alleged agent as an employee at will;

> (4) whether the alleged agent was receiving compensation from the alleged principal; and

> (5) whether the principal had the ability to control the agent's daily work and responsibilities.

*See, e.g., Meretta,* 491 N.W.2d at 280; *Alar v. Mercy Memorial Hospital,* 208 Mich.App. 518, 529 N.W.2d 318, 322; *Little v. Howard Johnson Co.,* 183 Mich.App. 675, 682, 455 N.W.2d 390, 393–394. Moreover, the party asserting that the agency exists has the burden of proof on the issue. *See, e.g., Whitlow v. Monroe,* 296 Mich. 426, 430, 296 N.W. 314, 316 (1941); *Troietto v. G.H. Hammond Co.,* 110 F.2d 135, 137 (6th Cir.1940); *Northern Concrete Pipe, Inc. v. Phoenix Sprinkler & Heating Co.,* 16 Mich.App. 650, 168 N.W.2d 446 (1969); *Laidley v. Heigho,* 156 F.Supp. 195, 197 (E.D.Mich.1957).

ii. **There are material questions of fact regarding the existence of an agency relationship between Miro and Briggs.**

Defendants Briggs and Miro argue in their Motion for Summary Judgment that Briggs was not Miro's agent because: (1) Briggs

was "Of Counsel" at Miro, thus he was not a member of the firm; (2) Briggs is an attorney who holds himself out to and renders services to the public independent of his association with Miro; (3) Clients pay their bills to "Basil M. Briggs, P.C.;" (4) Invoices for services rendered to the Trust were submitted, at times, on letterhead that read, "Basil M. Briggs, P.C.;" (5) Briggs maintained a separate office, including paying his own rent, from 1990 through 1993; (6) Miro exercised no control over Briggs—Briggs selected the clients he represented and determined how to manage their cases; and (7) Briggs did not do Miro's business on behalf of Miro—in particular, the Trust and the Co–Trustees were Briggs' clients prior to his association with Miro.

Plaintiffs respond that: (1) some of Briggs' correspondence was sent on Miro letterhead; (2) he maintained offices at Miro's place of business at some point in time; (3) he received medical insurance through the Miro firm; (4) he is covered under Miro's malpractice insurance policies; (5) calls placed to Briggs were answered by an employee of Miro; (6) he used Miro's support staff for assistance in handling legal matters; (7) he used Miro's office equipment—photocopiers, faxes, etc.; and (8) Miro lawyers and legal assistants worked on matters for Briggs' clients.[27]

In light of the arguments made by the parties, it is apparent that a genuine issue of material facts exits as to whether or not Briggs was Miro's agent. Thus, the Court must deny Miro's Motion for Summary Judgment on this issue and on issues related thereto which are also questions of fact, i.e., whether Briggs acted within the scope of his agency and whether his status as an agent made the commission of the alleged torts possible.[28] However, at trial, Plaintiffs will bear the burden of proof on these issues.

### 2. *Plaintiffs' Malpractice Claims against Prince.*

In the Amended Complaint, Plaintiffs allege that Prince was negligent in her legal representation of the Trust by:

(1) failing to fully and fairly disclose to Co–Trustees Clyde and Ann Hart that she was representing the interests of Comerica to the detriment of the Trust and its beneficiaries, while receiving payment from the Trust;

(2) violating MRPC 1.16(a) by failing to withdraw as Counsel for the Trust given her conflicts of interest;

(3) violating MRPC 1.4(b) by failing to explain matters to the Co–Trustees to the extent reasonably necessary to permit them to make informed decisions regarding her representation and the management of the Trust;

(4) violating MRPC 8.4 by engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation;

(5) failing to exercise reasonable care in acting as the attorney for the Co–Trustees; and

(6) failing to inform the Co–Trustees of the potential conflicts of interest regarding Comerica's loan-making activities with the Trust and its beneficiaries.

In her Motion for Summary Judgment, Prince argues that Plaintiffs have no legally cognizable claim against her for malpractice as a matter of law because (1) she had no attorney-client relationship with Cammie

---

**27.** Moreover, the Court notes that in this matter, Briggs and Miro are represented by the same counsel—likely because they are covered by the same malpractice insurance carrier.

**28.** At the hearing on these Motions, Miro and Briggs' counsel argued that Plaintiffs could not hold Miro liable for malpractice as Briggs' agent since the Plaintiffs did not rely on the alleged agency. This argument misapprehends the law, as it is well-established that a principal is liable for the acts of its agent where the agent "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *McCann v. State of Michigan, Department of Mental Health,* 398 Mich. 65, 71, 247 N.W.2d 521, 526 (1976); *See also, Graves v. Wayne County,* 124 Mich.App. 36, 41, 333 N.W.2d 740, 743 (1983) (same). Arguably, Briggs was aided by Miro in accomplishing the alleged torts since his relationship with Miro facilitated his practice of law, including his representation of the Trust. Nevertheless, the Court need not decide this as it is a question of fact which is disputed and should be resolved by a jury.

Conserva or any other beneficiary; (2) she had no attorney-client relationship with Co–Trustees Clyde Hart and Ann Hart; and (3) she owed no duty to perform any tasks beyond the filing of the Petitions for Allowance of Accounts and to Allow Comerica to Act Despite Conflict.

### a. Plaintiffs May Maintain Malpractice Claims against Prince.

■■■ As an initial matter, the Court finds that, based on the reasoning it articulated regarding Cammie Conserva's malpractice claims, see discussion at III.C.1.a.ii of this Opinion, that Clyde Hart, as a Co–Trustee, and Cammie Conserva, as a remainder beneficiary, were knowing and foreseeable relying third-party beneficiaries of any legal work that Prince did on behalf of the Trust and/or on behalf of Comerica in its capacity as a Co–Trustee.[29] Thus, the Court need only deal with Prince's claim that she owed no duty to perform any tasks beyond the filing of the Petitions for Allowance of Accounts and to Allow Comerica to Act Despite Conflict.

### b. The Scope of Prince's Duties and the Consequent Extent of Her Liability.

#### i. The arguments of the parties.

In her Motion for Summary Judgment, Prince states that Vasileff retained her to file Petitions and Orders in the Probate Court asking the Court to approve the Allowance of Accounts and to allow Comerica to Act Despite Conflict. Therefore, she claims that she looked to Vasileff for instructions during the course of her work before the Probate Court regarding the management of the Trust and that she performed all that Vasileff requested of her. Moreover, she asserts that her performance of these discrete requests was reasonable and competent because she justifiably relied only upon the documents that Vasileff gave her with regard to filing the Petitions and Orders.

Plaintiffs respond that when Vasileff retained her as attorney for the Co–Trustees, he retained her to "become attorney of record for this account" and accordingly, that she had a duty to reasonably investigate the Trust and its management and advise the Co–Trustees and the beneficiaries before and after she filed the Petitions pursuant to Vasileff's requests and relied exclusively upon the information with which he provided her.

After reviewing the parties' pleadings, it is apparent to the Court that Prince's assertion that Vasileff retained her only to file the Petitions and Orders before the Probate Court is contradicted by her retention letter from Vasileff and the fact that she stated in a December 6, 1995 letter to Jane Hart that she had been counsel to the Co–Trustees for over a year—including receiving compensation from the Trust throughout this period—all of which clearly suggests that she was, in Vasileff's words, the "attorney of record for this [Trust] account." Thus, the question ultimately becomes whether or not Plaintiffs can, as a matter of law, hold Prince liable for malpractice.

Prince has answered this question in her Summary Judgment Motion by arguing that her representation of the Co–Trustees and the Trust was reasonable and adequate and that she had no duty to investigate the facts and documents that Vasileff gave her. Plaintiffs counter that Prince's legal representation was negligent because she acted despite having a conflict of interest—her husband was a Comerica executive and Vasileff's boss; because she did not advise or inform her clients—the Co–Trustees—in a manner which would permit them to make well-in-

---

29. The parties spend a great deal of time in the pleadings discussing who hired Prince and on whose behalf she was working, including Prince's argument that although she thought the Co–Trustees were her clients, they must not have been since the Co–Trustees Ann and Clyde Hart did not consider her to be their lawyer given that they did not hire her. Even if the Court were to find that Prince was hired by Comerica to work for Comerica, it is indisputable that Prince was working on behalf of Comerica pursuant to its status as a Co–Trustee of the Jane Hart Trust and that she was being paid by the Trust. Thus, it is also indisputable that the Plaintiffs—as a Co–Trustee and a remainder beneficiary—were foreseeable and known relying third-party beneficiaries of this legal work and that Prince treated them as such—sending them notices and documents and letters regarding the legal affairs of the Trust. Moreover, their interests, at least ostensibly, should have been identical to those of Co–Trustee Comerica—the health and sound management of the Trust.

formed and reasoned decisions; and because she made statements to the Co–Trustees which were fraudulent and misleading. In particular, Plaintiffs assert that Prince had a duty to:

(1) identify and discuss with the Co–Trustees the conflicts of interest involved with Comerica, Briggs, the Trust, and herself;

(2) identify and discuss with the Co–Trustees their rights and/or duties to question transactions which occurred prior to her involvement with the Trust;

(3) identify and discuss with the Co–Trustees their rights and/or duties to question conflicts of interest which existed prior to her involvement with the Trust;

(4) inform the Co–Trustees that the February 1992 Order did not specifically authorize and approve Comerica's conflict of interest, instead of her misrepresenting to them that it did;

(5) explain to the Co–Trustees why in December 1994 they were allowing 8 years of prior accounts and what was the legal effect of allowing the accounts;

(6) explain to the Co–Trustees that the unsigned Consents were irrelevant to the Probate Court's approval of the Accountings and Petitions;

(7) explain to the Co–Trustees that under Michigan law that the beneficiaries who wished to object to the Annual Accounts or the Petition needed to file written objections or appear personally before the Court;

(8) disclose any information to the Co–Trustees regarding the scope of her representation of them;

(9) inform and explain to the Co–Trustees that they or the beneficiaries could appeal any Probate Court Order;

(10) inform and explain to the Co–Trustees that they or the beneficiaries could ask for a re-hearing of any Probate Court Order; and

(11) inform and explain to the Co–Trustees that they or the beneficiaries could file a Motion to Vacate any Probate Court Order.

Despite this long list of allegations, Prince's argument for avoiding malpractice liability as a matter of law is, essentially, that she had no duty to do anything but file the Petitions and Orders as Vasileff requested, and that, because she reasonably relied on his instructions and the documents he provided her with, she cannot be liable to the Co–Trustees or the beneficiaries for malpractice.

#### ii. *The duties of an attorney.*

 It is well-established that an attorney has an obligation to use reasonable skills, discretion, and judgment in representing clients, thereby assuming a position of the highest trust and confidence. *See, e.g., Green, supra,* 172 Mich.App. at 323, 431 N.W.2d at 503; *Beattie v. Firnschild,* 152 Mich.App. 785, 790, 394 N.W.2d 107, 109 (1986). As a general principle, an attorney must bring to bear the skill, learning, and ability of the average practitioner of law when conducting legal business for a client, including exercising ordinary care and diligence in the handling of the client's interests. *See, e.g., Beattie,* 152 Mich.App. at 791, 394 N.W.2d at 109–110. When examining legal malpractice questions, courts should look to the MRPC for the general standards of professional conduct expected of lawyers in their relationships with the public, the legal system, and the legal profession. *See, e.g., Id.* Indeed, violations of the MRPC create a rebuttable presumption of legal malpractice, although they do not constitute negligence *per se. See, e.g., Id.*

The MRPC articulates many standards and duties which are relevant to Prince's conduct in this matter. First, the MRPC imposes rigorous duties on a lawyer regarding the breadth of advice and communication with which he or she should provide a client. MRPC Rule 1.4 states that "[a] lawyer shall keep a client reasonably informed about the status of a matter ... and explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Moreover,

> [i]n representing a client, a lawyer shall exercise *independent professional judgment* and shall render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social, and politi-

cal factors that may be relevant to the client's situation.

MRPC Rule 2.1 (*emphasis* added) The Comments to Rule 2.1 provide that

[i]n general a lawyer is not expected to give advice until asked by the client. However, *when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client the duty under Rule 1.4 [as discussed above] may require that the lawyer act if the client's course of action is related to the representation.* A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, *but a lawyer may initiate advice to a client when doing so appears to be in the client's interest* ...

[Moreover,] purely technical legal advice ... can sometimes be inadequate. It is proper for a lawyer to refer to relevant moral and ethical considerations in giving advice ...

[Additionally,] [m]atters that go beyond strictly legal questions may ... be in the domain of another profession ... [including] business matters [which] can involve problems within the competence of the accounting profession or of financial specialists. *Where consultation with a professional in another field is something a competent lawyer would recommend, the lawyer should make such a recommendation.* At the same time, a lawyer's advice at its best often consists of recommending a course of action in the face of conflicting recommendations of experts.

(*Emphasis* added).

The MRPC also articulates guidelines and preventative measures for lawyers to consider regarding conflicts of interest. In particular, MRPC Rule 1.7 states that ·

[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests unless: (1) the lawyer reasonably believes the representation will not be adversely

affected; and (2) the client consents after consultation.

The Comments to this Rule explain that the [r]elevant factors in determining whether there is potential for adverse effect [from a conflict of interest] include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise, and the likely prejudice to the client from the conflict if it does arise. *The question is often one of proximity and degree.*

(*Emphasis* added). Moreover, as a general matter, "[a] lawyer *should not accept [a] representation ... unless it can be performed* competently, promptly, *without improper conflict of interest* and to completion." Comment to MRPC Rule 1.16 (*emphasis* added).

 Clearly, as "attorney of record," Prince had more substantial obligations than merely filing the Petitions and Orders and relying only upon Vasileff's words and the documents he gave her. Beyond what the Co–Trustees or Vasileff specifically requested, Prince had a duty to inform the Co–Trustees of the consequences of the Petitions and Orders. In particular, she should have made sure that they knew what rights, remedies, or recourse they had or may have had in the future incident to the matters before the Probate Court, even without imposing on her an obligation of continuing guidance and counseling—an obligation she evidently assumed by proclaiming herself as counsel to the Co–Trustees through December 1995 and by continuing to receive compensation from the Trust long after the Petitions and Orders were filed and entered.

 Moreover, Prince's even agreeing to this representation seems unwise and fraught with the seeds of future trouble. The fact that Comerica was a Co–Trustee and a foreclosing lender of her client should have made her investigate further to determine if her marriage to a Comerica Trust Department executive would in any way limit or compromise her representation. In the course of this investigation, perhaps, Prince may have discovered the conflicts of interest and potential for fraud and overreaching

which were inherent to the entire management of the Jane Hart Trust and the loaning, pledging, and selling of its assets. Then, it would have been even more incumbent upon her to disclose her husband's relationship with Comerica to the individual Co–Trustees.

Therefore, under the circumstances currently before the Court, the Court cannot say that Prince is entitled to Summary Judgment as a matter of law. Plaintiffs' allegations raise serious questions about the propriety of her conduct as a lawyer, questions which cannot go away by her merely stating that her only duty was to file the Petitions and Orders and take instructions from Vasileff and rely only on his statements and documents. Indeed, the MRPC and common sense make it obvious that Prince should have considered more carefully the propriety of her representation and the potential adverse impacts that the legal work she was doing would have on the Trust and its beneficiaries, as well as noting how her actions would improve the financial position of Comerica, her husband's employer. It goes without saying that, at the very least, she should have disclosed to her clients that her husband was a Comerica executive and was Vasileff's boss.

## IV. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that, pursuant to the *Rooker–Feldman* Doctrine, Plaintiffs' Counts I and III–IX are DISMISSED WITH PREJUDICE; [30]

IT IS FURTHER ORDERED that the Court retains jurisdiction over Plaintiffs' Counts II and the related portions of Counts VI and VIII;

IT IS FURTHER ORDERED that Defendants Miro, Briggs, and Prince's Motions for Summary Judgment as to Count II and the related portions of Counts VI and VIII are DENIED;

IT IS FURTHER ORDERED that the Cross–Claims, Counter–Claims, and Third

Party Complaints are DISMISSED AS MOOT.

---

**30.** As noted in the Opinion, this dismissal, although with prejudice, is not a decision on the merits, but rather on jurisdictional grounds.